UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BRENDAN A. NUNEMACHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21 CV 427 DDN |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Brendan A. Nunemacher for disability insurance benefits under Title II of the Social Security Act. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, the decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff Brendan A. Nunemacher, who was born on May 29, 1968, protectively filed his application for Title II benefits on September 1, 2017, with an alleged date of onset of February 22, 2017. (Tr. 16.) He alleged disability due to narcolepsy type 2, severe

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action. No further action is needed for this action to continue. See 42 U.S.C. § 405(g) (last sentence).

obstructive sleep apnea, parasomnia, Behcet's disease[2], primary osteoarthritis involving multiple joints, fibromyalgia, carpal tunnel syndrome, ruptured disc, degenerative disc disease, and depression/anxiety.  (Tr. 277.)  His claim was denied, and he requested a hearing before an administrative law judge (ALJ).  (Tr. 113, 121.)

On September 6, 2019, plaintiff testified before an ALJ.  (Tr. 41-94.)  On January 6, 2020, the ALJ issued an unfavorable decision, concluding that plaintiff was not disabled. (Tr. 31.)  The Appeals Council denied plaintiff's request for review on December 16, 2020. (Tr. 5-7.)   The decision of the ALJ therefore stands as the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).

## II.  MEDICAL AND OTHER HISTORY

The following is a summary of plaintiff's medical and other history relevant to this appeal.

On May 5, 2017, plaintiff saw Jennifer Sewing, DO, his primary care provider.  His diagnoses included Behcet's disease, narcolepsy without cataplexy,[3] parasomnia,[4] obstructive sleep apnea, hypertension, lumbar radiculopathy, depression, gastroesophageal reflux disease, obesity, and carpal tunnel syndrome.  He stated that his symptoms of Behcet's disease included thrush, mouth dryness, and traveling pain.  He indicated that he was compliant with all medications, including Adderall to treat narcolepsy.  The review of systems and physical exam yielded normal findings.  (Tr. 739-44.)

---

[2] Behcet's disease is a rare disorder that causes blood vessel inflammation throughout the body.        https://www.mayoclinic.org/diseases-conditions/behcets-disease/symptoms-causes/syc-20351326.

[3] Cataplexy is the sudden loss of muscle tone while awake, leading to weakness and loss of voluntary muscle control.  https://www.ninds.nih.gov/health-information/patient-caregiver-education/fact-sheets/narcolepsy-fact-sheet.

[4] Parasomnia is a sleep disorder that involves unusual or undesirable physical events or experiences that disrupt sleep.    https://my.clevelandclinic.org/health/diseases/12133-parasomnias--disruptive-sleep-disorders.

On May 8, 2017, plaintiff saw Basmah Jalil, MD, for previously diagnosed Behcet's disease, as well as widespread pain, fatigue, and allodynia.[5]  He exhibited tenderness and multiple fibromyalgia tender points, but his review of systems was otherwise normal.  Dr. Jalil diagnosed plaintiff with fibromyalgia.  He recommended regular aerobic exercise and psychological counseling, in addition to pharmacological treatment.  (Tr. 586-90.)

On August 21, 2017, plaintiff underwent surgery to repair the rotator cuff in his right shoulder.  He followed up on September 29 and October 13 and 20 for wound care, but otherwise had no complications.  (Tr. 553-63.)

On September 1, 2017, plaintiff followed up with Dr. Sewing for management of his chronic conditions.  He stated that he was compliant with nightly continuous positive airway pressure (CPAP) machine use but still experienced fatigue during the day.  He indicated that he was compliant with all medications.  His review of systems was positive for fatigue and neck pain but was otherwise normal.  (Tr. 747-48.)

On January 12, 2018, plaintiff saw Dr. Sewing.  He reported continued chronic shoulder pain following surgery to repair the rotator cuff in his right shoulder.  He indicated that he was compliant with all medications, though he discontinued therapy due to cost. The review of systems was positive for urinary urgency, narcolepsy, depression, joint pain, arthritic manifestations, and right shoulder and elbow pain.  (753-54.)

Plaintiff followed up with Dr. Sewing on May 7, 2018.  He reported that sleep is a significant issue, with episodes of sleeping 18 hours per day followed up by periods of not sleeping at all for two days.  He was experiencing personal stressors, including family and legal issues.  He stated that he could not afford his Adderall prescription to help with narcolepsy and that he was unable to see a therapist due to cost.  He indicated that he was compliant with medications for other conditions as well as with nightly CPAP use.  The review of systems was positive for anxiety, depression, stress, and back, joint, and wrist pain.  (Tr. 759-60.)

---

[5] Allodynia is a type of neuropathic pain due to stimulus that does not normally provoke pain.  https://www.ncbi.nlm.nih.gov/books/NBK537129/.

Also on May 7, 2018, plaintiff saw Raman Malhotra, MD, at the Washington University Sleep Medicine Clinic for excessive daytime sleepiness. He reported many life stressors. He stated that he had given up on his sleep symptoms ever getting better and had not been regularly taking any of his medications. He was out of his stimulant medication and could not afford to refill the prescription. Additionally, his CPAP was broken, and he could not replace it because it was not covered by insurance. He indicated that he was sleeping between 7:30 AM and 1:30 PM; even with medication compliance, he would still take frequent naps during the day up to 75 percent of the time. Without medication, he would frequently sleep all day. He had trouble falling asleep at night and continues to have sleep paralysis and hallucinations. He was working on sleep hygiene. He continued to drive but would pull over if he was excessively sleepy, and he would have someone else drive on extended trips. His Epworth sleepiness score at the visit was 19/24, indicating abnormal sleepiness. The download from his CPAP machine demonstrated usage of the machine 67 percent of nights, with usage greater than 4 hours at 33 percent. Plaintiff stated that he did not use it when he fell asleep by mistake and that he felt the machine was not recording his usage accurately. (Tr. 768.)

On June 23, August 15, and December 26, 2017, and January 25 and April 26, 2018, plaintiff saw Basmah Jalil, MD, for follow up for Behcet's disease and fibromyalgia. He stated that he continued to have joint pain and stiffness everywhere. Tenderness was sometimes present on palpation of the joints, including wrists, elbows, shoulders, and knees. Plaintiff always had multiple fibromyalgia tender points. The reviews of systems were otherwise normal. (Tr. 531-32.)

On July 23, 2018, plaintiff saw Hugh Berry, MD, for pain management. He reported new low back pain radiating into left leg pain as a result of helping transfer his girlfriend when she was in the hospital. Dr. Berry ordered an MRI and referred plaintiff to physical therapy. (Tr. 797-801.)

On July 25, 2018, plaintiff saw Dany Thekkemuriyil, MD, for follow up for Behcet's disease and fibromyalgia. He reported continued stiffness and joint pain. Tenderness was present on palpation of his joints, including wrists, elbows, shoulders, and

knees, and multiple fibromyalgia tender points were present.  (Tr. 794.)  Plaintiff saw Dr. Thekkemuriyil for follow up and pain management throughout 2018 and 2019.  (Tr. 840, 847, 853, 861, 874, 1006, 1225, 1246.)

On July 26, 2018, plaintiff again saw Dr. Malhotra for narcolepsy.  He reported that he continued to use his CPAP machine and stated that he believed the machine was not properly recording his usage.  He stated that he sometimes did not use the machine because he would fall asleep outside of his bedroom.  He indicated that he did not always take his entire dosage of Adderall, but that it helped.  He reported high stress levels due to insurance coverage, money, and his chronic health conditions.  Dr. Malhotra encouraged plaintiff to see a counselor or psychiatrist to address the underlying depression and anxiety, as it was likely worsening his sleep issues.  (Tr. 771, 775.)

On August 14, 2018, plaintiff saw Terri Lynn Riutcel, MD, at the Washington University Sleep Medicine Center Insomnia Clinic for behavioral evaluation and treatment of insomnia.  He stated that he is "nocturnal by default."  He was able to adjust his sleep schedule when he took a day job until it became stressful, which he stated triggered his narcolepsy.  He reported inadvertent dozing once or twice per day.  He stated that he did not take Adderall regularly because he cannot afford the prescription refills.  He indicated that he wanted to leave a "conflictual home" but could afford to do so; he also could not continue therapy due to cost.  Dr. Riutcel provided several recommendations to establish a regular sleep routine.  (Tr. 776-80.)

On August 25, 2018, Dr. Sewing submitted a letter regarding plaintiff's ability to work.  She opined that due to his medical conditions, specifically narcolepsy and chronic insomnia, he cannot hold any type of meaningful work.  She provided some conditions under which plaintiff could work, including sedentary, desk-type work that would not require interaction with the public; no machinery; no prolonged mental focus; no one waiting on him to complete tasks; ability to break for undetermined time periods when he is sleepy or unfocused; and ability to arrive late due to oversleeping.  Because Dr. Sewing did not know of a job that makes these types of accommodations, she opined that plaintiff is disabled.  (Tr. 1033-34.)

On October 29, 2018, plaintiff followed up with Dr. Malhotra.  He reported difficulty controlling his symptoms as well as other medical, social, and psychological issues contributing to his sleepiness.  He also indicated significant stress.  His sleep schedule remained erratic, and he had been unable to implement the behavioral strategies recommended by Dr. Riutcel.  (Tr. 1004.)

On November 2, 2018, plaintiff followed up with Dr. Riutcel.  His mental status exam showed normal findings.  He stated that he had been trying to wind down by 10 PM and go to bed by 2 AM, which he believed he did about 65 percent of the time.  Dr. Riutcel noted that he was making progress toward establishing a regular bedtime and sleep schedule.  (Tr. 1015-17.)

On November 6, 2018, Dr. Sewing completed a statement of disability form for plaintiff.  She stated that due to narcolepsy and the risk of falling asleep, most jobs were out of the question for safety reasons.  She also noted that narcolepsy and Behcet's disease are chronic conditions that would affect plaintiff even with treatment.  (Tr. 1057.)

On January 29, 2019, plaintiff followed up with Dr. Riutcel.  He stated that he was maintaining a more regular sleep schedule except when he "crashed" and slept all day, which occurred every ten days or so.  (Tr. 1024.)

On April 11, 2019, plaintiff followed up with Dr. Riutcel.  He reported that he had recently been experiencing an illness and problems with housing that affected his ability to adhere to Dr. Riutcel's recommendations.  Dr. Riutcel noted plaintiff's illness and significant psychosocial stressors and stated that she did not have much to offer him until his stress abated and living situation became more stable.  (Tr. 1020-22.)

On May 15, 2019, plaintiff followed up with Dr. Malhotra.  He reported missing doses of one of his medications, baclofen, but complying with his Adderall medication. His review of systems showed weight loss, headache, tingling, anxiety, depression, back pain, joint pain, and cold intolerance.  His physical exam yielded normal findings.  (Tr. 1183-87.)

From May through July 2019, plaintiff saw David Oliver, PLPC, for psychological therapy.  Mental status examinations were generally normal, including normal appearance,

behavior, affect, thought process, perception, insight, sleep, orientation, thought content, and judgment.  His mood was sometimes mildly to moderately anxious, and his speech was sometimes fast.  (Tr. 905-15.)

On August 14, 2019, plaintiff followed up with Dr. Malhotra.  He reported high psychosocial stress, which was affecting his sleep.  He stated that he was using Adderall as prescribed but still experiencing significant daytime sleepiness.  His review of systems was positive for stress, anxiety, depression, back pain, joint pain, muscle aches, and cramps.  His physical exam yielded normal findings.  Dr. Malhotra advised plaintiff to focus on his life and family stressors, as these stressors contributed to his worsening condition.  (Tr. 1189-93.)

On October 15, 2019, plaintiff underwent a consultative psychological examination with Paul W. Rexroat, Ph.D.  Plaintiff stated that he persistently feels anger and that he has been depressed since childhood.  He said that he has trouble getting along with others because he dislikes many other people's behaviors.  Dr. Rexroat found that plaintiff exhibited adequate social skills during the interview.  He appeared to be functioning in the average range of intelligence with good memory and orientation for person, place, time, and situation.  Dr. Rexroat found that plaintiff had mild limitations in his ability to understand, remember, or apply information; marked limitations in his ability to interact with others due to depression and anxiety; mild limitations in his ability to concentrate, persist, and maintain pace, and moderate limitations in his ability to adapt and manage himself again due to depression and anxiety.  His motivation was good, but his prognosis was poor because of depression and anxiety.  (Tr. 1214-17.)

On December 16, 2019, plaintiff followed up with Dr. Malhotra.  He stated that he continued to have major social issues and severe daytime sleepiness along with disrupted sleep at night.  He indicated that shoulder and back pain were also affecting his sleep.  He reported compliance with his medication, though he still had significant sleepiness; additionally, he stated that his therapist was concerned that Adderall was worsening his anxiety.  Dr. Malhotra noted that plaintiff's worsening condition and non-adherence with CPAP machine usage may have been due to the high levels of stress in his personal life.

Dr. Malhotra prescribed Sunosi, another medication to help with sleepiness that would hopefully not worsen plaintiff's anxiety.  (Tr. 1276-81.)

### ALJ Hearing

On September 6, 2019, plaintiff appeared before an ALJ and testified to the following.  He has an associate degree and certification in surgical technology, as well as certifications as an emergency medical technician and an adult care home manager.  (Tr. 45.)  He has not worked since February 2017, when he began medical leave.  (*Id*.)  From 2012 to 2017, he worked as a surgical technician in an operating room.  (Tr. 46, 48.)  His responsibilities included sterilizing the operating room, setting up the instruments, and assisting the surgeon during the procedure.  (*Id*.)  He would sometimes need to lift and carry instruments weighing 50 pounds or more.  (Tr. 47-48.)  From 2008 to 2012, he assisted an insurance adjuster, primarily working on the computer and conducting telephone interviews with claimants.  (Tr. 48.)  From 2003 to 2007, he worked as a production assistant for a bank branch manager, assisting with loan origination and other office duties.  (Tr. 50.)

Plaintiff stopped working in February 2017 because he was exhausted all the time and could no longer stay awake during surgery, and he struggled with hand coordination while using surgical instruments.  (Tr. 51.)  He felt that he was a danger to patients.  (*Id*.)  He takes Adderall to treat his narcolepsy, but it does not control his symptoms.  (Tr. 52-53.)  Sometimes, he falls asleep for four to five hours after taking Adderall in the morning.  (Tr. 53.)  He has a CPAP machine at his bedside to treat sleep apnea, but he does not use it consistently because he does not always make it to his bed before falling asleep.  (Tr. 53-54.)  He has ruptured discs at L4/L5 and L5/S1.  (Tr. 55.)  The ruptured discs have caused loss of reflex and chronic numbness in his right foot as well as pain down his left leg and in his back.  (*Id*.)

Plaintiff's anxiety manifests as anger at others and himself.  (Tr. 58.)  He takes Paxil and Xanax to treat his anxiety, which help a lot, and he sees a counselor once a week.  (*Id*.)  His depression is linked to his anxiety.  (Tr. 59.)  He has suicidal ideation, but he is not a

threat to himself because he will not leave his kids. (*Id*.) His symptoms are mostly controlled when he is on medication. (*Id*.) His therapist believes that he also has post-traumatic stress disorder. (Tr. 60.)

He sometimes limps and has difficulty walking when his back pain flares. (*Id*.) He can walk about 400 yards before he has to rest for hours. (Tr. 61.) He can stand for 30 minutes to make a meal or do dishes. (*Id*.) His ability to walk and stand is different every day, depending on his level of pain. (*Id*.) He can sit longer than he can stand. (Tr. 62.) He can cook simple meals. (*Id*.) He experiences pain in his shoulders, neck, and back while vacuuming or mowing the lawn, but he can do laundry. (Tr. 63.) He can go grocery shopping, though he sometimes gets lost and forgets what he is doing due to narcolepsy. (Tr. 64.) Other than walking his dogs occasionally, he does not participate in any outdoor activities or hobbies. (*Id*.) He stopped playing guitar around 2010, and he does not play games on the computer anymore because he cannot concentrate on them. (Tr. 65.)

He has pain in his right shoulder, and it hurts to raise his arm and lift objects. (Tr. 57, 66.) Behcet's disease affects all of his joints, and it causes numbness in his hands; he cannot grasp or hold things. (Tr. 66.)

He is naturally a day sleeper, and his sleep patterns are erratic. (Tr. 67.) He engages in "automatic behavior," especially at night, due to narcolepsy, which means that he acts without awareness of his actions. (Tr. 51, 67.) He once fell asleep with a laptop on his leg and suffered burns; the burning did not wake him up. (Tr. 68.) Narcolepsy makes it difficult for him to maintain a schedule because he cannot focus, and it feels like his brain is not working with his body. (*Id*.) He applied for coverage under the Family and Medical Leave Act in 2015 because he was consistently arriving late to work. (Tr. 69.) He believes that Behcet's disease is a major contributor to the severity of his conditions, as it affects all of his joints and blood vessels. (Tr. 71.)

After attending a psychological consultative examination, on April 7, 2020, plaintiff appeared again before an ALJ and testified to the following. He underwent a right shoulder replacement on December 23, 2019. (Tr. 80.) The bicep muscle in his right arm has not recovered in any of its use or sensation, he cannot use his right arm to lift above his waist,

he cannot reach across his body with strength or accuracy, and he experiences numbness in his arm and hand.  (*Id*.)  He is not able to see a physical therapist because he does not have insurance or the ability to pay for it.  (Tr. 81.)  He was prescribed a home physical therapy protocol that involves passive and active range of motion exercises.  (*Id*.)  He is right-handed, so the symptoms affect his dominant arm.  (Tr. 82.)  His back symptoms remain the same since September 2019.  (*Id*.)

At the request of his therapist, he discontinued using Adderall to treat his narcolepsy in order to determine whether that medication caused his anxiety.  (Tr. 83.)  Without narcolepsy medication, he sleeps most of the time and is nonproductive.  (*Id*.)  His anxiety symptoms have not improved.  (*Id*.)  His current dosage of Adderall is less than half of the dosage he was prescribed before his shoulder replacement.  (Tr. 84.)  Even with his medication, he sleeps intermittently throughout the day and is often groggy when he is awake.  (*Id*.)  He is not currently taking medication for Behcet's disease, and he cannot refill his prescription for Paxil due to lack of insurance and inability to pay.  (Tr. 85-86.)

Also at the April 7, 2020, hearing, the vocational expert testified to the following. Plaintiff's past work falls into the following categories: surgical technician, light and skilled; driver, medium and semiskilled; loan officer, sedentary and skilled; and insurance adjuster, light and skilled.  (Tr. 88.)  The first hypothetical involved an individual with plaintiff's age, education, and job history that could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for six hours of an eight-hour day; reach frequently overhead to the left and right; reach frequently to the left and right; climb ramps and stairs but never ladders, ropes, or scaffolds; stoop, kneel, crouch, and crawl occasionally; never work at unprotected heights or around moving mechanical parts but occasionally work in extreme cold; perform simple, routine, and repetitive tasks, but not at a production rate pace; interact with supervisors and coworkers occasionally, but not the public beyond superficial contact; and make simple, work-related decisions.  (Tr. 88-89.) The individual in that hypothetical would not be able to engage in any of plaintiff's past jobs, as they involved tasks beyond simple and repetitive routine, as well as more than brief

and occasional contact with the public.  (Tr. 89.)  The hypothetical individual would be able to work as a router, routing clerk, and housekeeper.  (Tr. 90.)

The second hypothetical involved an individual with the same limitations as the first hypothetical, except that this individual could lift or carry no more than 10 pounds frequently and could sit for six hours and stand and walk for two hours of an eight-hour day.  (Tr. 90-91.)  The second hypothetical individual would not be able to perform plaintiff's past jobs for the same reasons as the first hypothetical individual, and there are no transferable skills.  (Tr. 91.)  The second hypothetical individual would not be able to engage in competitive employment at the sedentary level due to the limitations in production and contact with the public.  (*Id*.)  An individual off-task more than fifteen percent of the time in an eight-hour day or absent two days per month would not be able to maintain competitive employment.  (Tr. 93.)

### III.  DECISION OF THE ALJ

On April 22, 2020, the ALJ issued a decision that plaintiff was not disabled from February 22, 2017, to the date of the decision.  (Tr. 16.)  At Step One, the ALJ found that plaintiff has not engaged in substantial gainful activity since February 22, 2017, the alleged onset date.  (Tr. 18.)  At Step Two, the ALJ found that plaintiff has the following severe impairments: obesity, narcolepsy, obstructive sleep apnea, Behcet's disease, fibromyalgia, degenerative disc disease with radiculopathy, post status right shoulder arthroplasty, arthritis, major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder.  (*Id*.)  The ALJ found that two additional impairments reflected in the medical record, osteoarthritis of the fingers and gastroesophageal reflux disease, were non-severe.  (Tr. 19.)

At Step Three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that met or medically equaled an impairment on the Commissioner's list of presumptively disabling impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)  The ALJ considered three listings for plaintiff's physical impairments and concluded that there was not enough evidence in the record to satisfy those listings.

- 11 -

(*Id.*)  Further, the ALJ considered the relevant listings for plaintiff's mental impairments, which require, in paragraph B of the listings, that the impairments result in one extreme limitation or two marked limitations in four broad areas of functioning.  (*Id.*)  The ALJ found that plaintiff has a marked limitation in interacting with others and moderate limitations in the other three areas of functioning.  (Tr. 20.)  The ALJ therefore concluded that plaintiff's mental impairments do not meet or equal the listings.  (Tr. 21.)

At Step Four, the ALJ found that plaintiff has the residual functional capacity (RFC) to perform light work, as defined in 20 C.F.R. 404.1567(b), with some exceptions.  He can reach frequently to the right and left, overhead and otherwise.  (*Id.*)  He can climb ramps and stairs occasionally, but never ladders, ropes, or scaffolds; he can occasionally stoop, kneel, crouch, and crawl.  (*Id.*)  He can never work at unprotected heights or around moving mechanical parts, but he can work in extreme cold occasionally.  (*Id.*)  He can perform simple, routine, and repetitive tasks but not at a production rate pace.  (*Id.*)  He can occasionally interact with supervisors and with coworkers, but he would be limited to jobs that do not require public contact as part of the duties; he could occasionally have brief, superficial contact with the public.  (*Id.*)  He can make simple work-related decisions.  (*Id.*)

At Step Five, the ALJ concluded, based on the testimony of the VE, that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, including router, routing clerk, and cleaner.  (Tr. 30.)  The ALJ therefore concluded that plaintiff had not been disabled under the Act.  (Tr. 31.)

## IV.  GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  *Id.*  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision.  *Id.*  As long as substantial

evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The Court will not "disturb the denial of benefits so long as the ALJ's decisions falls within the available zone of choice." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least 12 continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant has the RFC to perform his past relevant work (PRW). 20 C.F.R. §§ 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. §§ 404.1520(a)(4)(v).

## V.  DISCUSSION

### *Social interaction*

Plaintiff argues that defendant erred in formulating an RFC that did not properly take into account plaintiff's marked limitations in social interaction. (Doc. 20 at 21.) He

- 13 -

contends that the ALJ's conclusion that he can occasionally interact with supervisors and coworkers, but not with the public, is inconsistent with Dr. Rexroat's finding that he is markedly impaired in all areas of social functioning.  (*Id*. at 24.)  He asserts that Dr. Rexroat did not differentiate between supervisors, coworkers, and the public in making his findings, and the ALJ's inconsistent conclusions regarding plaintiff's RFC are not harmless error, as a more restrictive RFC could have precluded all work.  (*Id*. at 25.)

Defendant contends that Dr. Rexroat's brief and vague statement that plaintiff has marked limitations in his ability to interact with others, caused by depression and anxiety, does not specifically provide for limitations.  (Doc. 29 at 13.)  Defendant further argues that the ALJ harmonized the finding of marked limitation in social interaction with the RFC, taking into account both plaintiff's subjective complaints and his pleasant demeanor with medical professionals and his activities of daily living.  (*Id*. at 14.)

Plaintiff reiterates in reply that the ALJ's conclusion as to his social limitations is inconsistent.  (Doc. 30 at 5.)  He contends that Dr. Rexroat's finding of his marked limitations was not vague and is a term of art.  (*Id*. at 6.)  Plaintiff notes that the ALJ found Dr. Rexroat's opinion persuasive but that the ALJ did not discuss the inconsistency between the RFC limitations.  (*Id*.)

Residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence.  *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).  The claimant has the burden to establish his RFC.  *Mabry v. Colvin,* 815 F.3d 386, 390 (8th Cir. 2016).   The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  RFC is a medical question, which must be supported by medical evidence contained in the record.  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  The RFC need only include the limitations supported by the record.  *Tindell v. Barnhart*, 444 F.3d 1002, 1007 (8th Cir. 2006).  There is no requirement that an RFC finding be supported by a specific medical opinion.  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  Though

the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Winn v. Comm'r, Soc. Sec. Admin.*, 894 F.3d 982, 987 (8th Cir. 2018).

The ALJ concluded that plaintiff has a marked limitation in interacting with others. The ALJ credited his testimony regarding difficulty around others and not liking people but also noted mental status examinations finding normal mood, affect, insight, judgment, behavior, insight, and orientation.  (Tr. 20.)  In determining plaintiff's RFC, the ALJ appropriately considered Dr. Rexroat's opinion alongside the record as a whole.  The ALJ found the opinion of Dr. Rexroat persuasive because it was supported by Dr. Rexroat's own examination and the record.  (Tr. 28.)  During the consultative examination, Dr. Rexroat noted that he seemed nervous and very intense, but he was cooperative and exhibited normal affect and emotional responsiveness. (Tr. 1215.)  The record reflects one instance of plaintiff's anger during a session with his therapist, when he appeared angry and left the session "in an uncharacteristically quick manner."  (Tr. 915.)  Otherwise, during mental status examinations, plaintiff was noted to exhibit good eye contact and be pleasant, cooperative, and engaging.  (Tr. 779, 1017, 1022.)  In determining plaintiff's RFC, the ALJ credited his subjective reports of social difficulties and Dr. Rexroat's opinion while also considering evidence of his social skills in the record.  (Tr. 20.)  The ALJ's RFC determination as to plaintiff's social limitations is supported by substantial evidence and within the ALJ's zone of choice.

### Plaintiff's subjective complaints

Plaintiff also argues that defendant erred by failing to properly evaluate plaintiff's subjective complaints.  (Doc. 20 at 26.)  He contends that the ALJ failed to consider (1) the reasons for his medication noncompliance and (2) that plaintiff's treatment was not effective even when he was fully compliant.  (*Id*. at 29, 31.)  Defendant asserts in response that the ALJ properly considered plaintiff's statements along with the medical record and that plaintiff was frequently noncompliant regardless of his insurance or financial status. (Doc. 29 at 9.)

Part of the RFC determination includes an assessment of the claimant's credibility regarding subjective complaints. Using the *Polaski* factors, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (noting *Polaski* factors must be considered before discounting subjective complaints). The *Polaski* factors include (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322; see also 20 C.F.R. § 404.1529. "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

The ALJ appropriately considered plaintiff's failure to follow the recommended course of treatment, including during periods when he was able to afford his medication. For example, instead of taking one 30-milligram Adderall pill in the morning and another 30-milligram pill in the afternoon, as prescribed, plaintiff took both pills in the morning. (Tr. 22, 1000.) He stated that it helped for about an hour. (*Id.*) At another time, he stated that he was not always taking his entire dosage of Adderall. (Tr. 771.) He once reported that he had given up on his sleep conditions ever improving and was not regularly taking either stimulants or sedatives. (Tr. 22, 768, 770.) Plaintiff also reported that, during a period in which he was compliant with his Adderall prescription, he missed doses of another medication for insomnia about half the time. (Tr. 22, 1183.) He stated that he was unable to implement Dr. Riutcel's suggestions for sleep hygiene due to personal stressors and difficulty concentrating. (Tr. 23, 1004, 1020.)

The ALJ also properly considered other *Polaski* factors, including plaintiff's daily activities and functional restrictions. He maintains a driver's license with no restrictions, and he continues to drive unless he is excessively drowsy. (Tr. 26, 768, 832.) He can cook simple meals, do laundry, and shop for groceries, though he sometimes gets confused while shopping due to narcolepsy. (Tr. 62-64.) The ALJ's assessment of plaintiff's subjective complaints is supported by substantial evidence.

***Time off task and absenteeism***

Plaintiff argues that the ALJ erred by failing to properly evaluate his time off task and absenteeism.  (Doc. 20 at 34.)  He asserts that the record shows his substantial sleepiness, including taking naps once or twice per day at least twenty-two times per month.  (*Id*. at 36.)  He contends that if he sleeps nearly full days at a time, he could not work.  (*Id*. at 37.)  He also notes the VE's testimony that a hypothetical individual would be unemployable if absent two days per month or off task fifteen percent of the time or more during an eight-hour work day.  (*Id*.)  Defendant responds that there is not substantiating proof, including a medical opinion, for plaintiff's alleged limitations.  (Doc. 29 at 12.)  Defendant asserts that plaintiff's noncompliance with medication accounted significantly for his daytime sleepiness, and there is no medical opinion stating the plaintiff requires naps.  (*Id*. at 12-13.)  Plaintiff argues in reply that defendant acknowledges his sleep crashes every ten days or so, which would make him unemployable per the testimony of the VE.  (Doc. 20 at 2.)

As discussed above, the ALJ properly considered plaintiff's failure to follow the recommended course of treatment in evaluating his subjective complaints of limitations due to narcolepsy.  Plaintiff stated that when he was maintaining a more regular schedule, he still had sleep crashes every ten days or so, during which he could not stay awake; however, he also stated at that time and others that he was not compliant with baclofen, a medication prescribed to help him sleep.  (Tr. 1024-25, 1179, 1183.)  Additionally, though Dr. Riutcel suggested using scheduled naps to eliminate plaintiff's sleep crashes, plaintiff was not able to implement her suggestion due to personal stressors.  (Tr. 1176, 1178.)  Therefore, there was substantial evidence in the record to support the ALJ's conclusion that plaintiff failed to follow the recommended course of treatment, which affected his potential time off task and absenteeism.

***Listing 11.02***

Plaintiff argues that defendant erred by failing to consider whether plaintiff's primary disabling condition, narcolepsy, met or equaled Listing 11.02, either individually

or in combination with his other impairments.  (Doc. 20 at 17.)  Plaintiff asserts that the ALJ's failure to discuss Listing 11.02 is reversible error, citing to *Green v. Comm'r, Soc. Sec. Admin.*, No. 5:19-06006-CR-RK, 2020 WL 1188448 (W.D. Mo. March 12, 2020). (*Id*. at 19.)  Plaintiff further argues that the ALJ's failure to identify and analyze the listing is not harmless because there is ample evidence in the record to support a finding that plaintiff met the listing, and the ALJ failed to consider narcolepsy in combination with plaintiff's mental impairments.  (*Id*. at 20.)

Defendant argues in response that *Green v. Comm'r, Soc. Sec. Admin.* does not carve out a special rule for narcolepsy; rather, it applies the rule that it is not reversible error if the record supports the ALJ's conclusion that a claimant does not meet a listing, even if the ALJ does not specifically discuss the listing.  (Doc. 29 at 5.)  Defendant further argues that the record shows that plaintiff did not meet Listing 11.02 or the criteria outlined in POMS DI 24680.005.  (*Id*. at 6.)  Defendant contends that the ALJ considered narcolepsy in connection with plaintiff's mental impairments and that plaintiff conflates his mental impairments with personal stressors.  (*Id*. at 7.)

Narcolepsy is not a listed impairment.  The Social Security Program Operations Manual System states that the closest listing to narcolepsy is Listing 11.02, epilepsy. POMS DI 24680.005 Evaluation of Narcolepsy.  It further directs that "[t]he severity of narcolepsy should be evaluated after three months of prescribed treatment," and "it is important to obtain from an ongoing treatment source a description of the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks . . ."  *Id*.  An ALJ's failure to analyze the appropriate listed impairment is reversible error unless the record otherwise supports the ALJ's overall conclusion.  *Brown v. Colvin*, 825 F.3d 936, 940 (8th Cir. 2016.)

The Court concludes that *Green v. Comm'r of Soc. Sec. Admin.* did not carve out a special rule for narcolepsy.  The court in *Green* could not determine whether substantial evidence on the record supported a finding that plaintiff did not meet Listing 11.02, so it reversed and remanded for further proceedings.  2020 WL 1188448 at *3.  Therefore, the

ALJ's failure to analyze narcolepsy in this case is reversible error unless the record otherwise supports the ALJ's overall conclusion.

The Court concludes that the ALJ's failure to discuss Listing 11.02 is harmless because there is insufficient evidence in the record that plaintiff met the requirements of POMS DI 24680.005.  As discussed above, plaintiff was not compliant with the recommended course of treatment, both in terms of prescribed medications and sleep hygiene recommendations.  There is not a three-month period in the record during which plaintiff followed prescribed treatment; therefore, the ALJ could not evaluate the severity of plaintiff's narcolepsy in accordance with the instructions in POMS DI 24680.005.

The Court also concludes that the ALJ did not err in failing to consider plaintiff's symptoms of narcolepsy in combination with his mental impairments.  The Court agrees that plaintiff's argument conflates his mental impairments with stress.  The ALJ concluded that plaintiff's severe impairments included major depressive disorder and generalized anxiety disorder.  (Tr. 18.)  Plaintiff frequently reported stress due to a variety of factors, including health insurance, money, his medical conditions, housing, and family and relationships.  (Tr. 759, 768, 771, 1004, 1180, 1187, 1189, 1276.)  However, plaintiff did not attribute or connect his reported personal stressors to his mental impairments. Moreover, the ALJ noted plaintiff's stress and its impact on his sleep schedule, as well as his lack of compliance with recommended sleep hygiene tasks.  (Tr. 23.)

Because the record otherwise supports the ALJ's overall conclusion, the failure to analyze Listing 11.02 is not reversible error.

### *Opinion of treating physician*

Last, plaintiff argues that the ALJ erred by improperly rejecting the opinions of his primary care physician, Dr. Sewing.  (Doc. 20 at 38.)  He contends that the ALJ's reasons for finding Dr. Sewing's opinion unpersuasive are inadequate, as plaintiff's subjective allegations are demonstrated in the medical record, the ALJ failed to address the reasons for medication non-compliance, and the ALJ applied an incorrect legal standard in

evaluating the opinion.   (*Id*.)   In response, defendant argues that the ALJ properly considered Dr. Sewing's opinion and found it unpersuasive because Dr. Sewing was plaintiff's primary care physician, not the physician treating him for narcolepsy.  (Doc. 29 at 15.)  Additionally, defendant argues that Dr. Sewing relied only on plaintiff's subjective reports and did not reference or attach any specific objective findings.  (*Id*.)  Lastly, defendant asserts that the ALJ properly rejected Dr. Sewing's opinion as to plaintiff's ability to work because she opined that he was disabled, which is a question reserved to the Commissioner.  (*Id*. at 16.)

In assessing a medical opinion, an ALJ may consider factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability with relevant medical evidence, consistency between the medical opinion and the record as a whole, the physician's specialization, and any other relevant factors brought to the attention of the ALJ.  *See* 20 C.F.R. § 404.1527(c)(1)-(6); *Owns v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (holding that when a treating physician's opinion is not entitled to controlling weight, the ALJ must consider several factors to determine the amount of weight given to the opinion).  Although an ALJ is not required to discuss all the relevant factors when determining what weight to give a physician's opinion, the ALJ must explain the weight given the medical opinion and give good reasons for doing so.  *See* 20 C.F.R. § 404.1527(c)(2).  "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence.'"  *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).  The determination of whether a claimant is disabled is reserved to the Commissioner; the Commissioner is therefore not required to give special significance to a statement from a medical source that a claimant is "disabled" or "unable to work."  20 C.F.R. § 404.1527(d)(1); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

In Dr. Sewing's August 26, 2018, letter, she opined that plaintiff could not hold any type of meaningful work due to his chronic medical conditions, specifically narcolepsy and chronic insomnia.  (Tr. 1033.)  She provided specific work limitations and stated that she

did not know of any job that would be able to accommodate the limitations.  (Tr. 1033-34.) She therefore opined that plaintiff was disabled.  (Tr. 1034.)  The ALJ found this opinion unpersuasive because it was unsupported by reference to specific medical findings, was inconsistent with the record showing substantial non-compliance with treatment, and spoke to plaintiff's ability to work, which is a question reserved to the Commissioner.  (Tr. 28.)

In the November 6, 2018, statement of disability, Dr. Sewing again opined that plaintiff was totally disabled due to narcolepsy and the risk of falling asleep.  (Tr. 1057.) The ALJ also found this opinion unpersuasive because it did not provide a function-by-function analysis of what plaintiff can and cannot do, and it spoke to plaintiff's ability to work.  (Tr. 28.)

The ALJ properly considered Dr. Sewing's opinions and gave good reasons for finding her opinions unpersuasive.  As the ALJ stated, both Dr. Sewing's letter and the statement of disability opined about plaintiff's limitations without citing relevant medical evidence.  (Tr. 28, 1033-34, 1057.)  The ALJ also pointed out that her opinions as stated in the letter were inconsistent with the record as a whole, as plaintiff was substantially non-compliant with prescribed medications.  (Tr. 28.)  Lastly, the ALJ did not err in rejecting Dr. Sewing's conclusion that plaintiff is disabled because it is a determination reserved to the Commissioner.  (Tr. 28, 1034, 1057.)  The Court concludes that the ALJ did not err in rejecting the opinions of Dr. Sewing.

## **CONCLUSION**

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


_____/s/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 26, 2022.

- 21 -